MAIN BANK & TRUST, Guardian of the Estate of Edward Villanueva, Appellant,

v.

Joe Key YORK, Jr., Administrator of the Estate of Joe Key York III, Appellee.

No. 15205.

Court of Civil Appeals of Texas, San Antonio.

July 25, 1973.

Rehearing Denied Sept. 19, 1973.

———◆———

Tinsman & Houser, Inc., Gordon W. Jones, Jr., San Antonio, for appellant.

Clemens, Weiss, Spencer & Welmaker, San Antonio, R. S. Crawford, Uvalde, for appellee.

BARROW, Chief Justice.

Main Bank & Trust, Guardian of the Estate of Edward Villanueva, has perfected this appeal from a judgment entered on a jury verdict in its suit to recover damages from Joe Key York, Jr., Administrator of the Estate of Joe Key York, III, for the wrongful deaths of the minor's parents. The sole question on this appeal relates to the adequacy of damages.

On November 27, 1971, at about 1:20 a.m., a head-on collision occurred on U.S. Highway 90, about eight miles east of Del Rio, between a 1960 Ford station wagon operated by Jose Villanueva and a 1972 Oldsmobile operated by Joe Key York, III, wherein eight persons lost their lives. Jose Villanueva and Victoria Villanueva, parents of Edward Villanueva, as well as Frank Villanueva, the two-year-old brother of Edward, were killed instantly. Other passengers in the Villanueva car who lost their lives were Juan and Guadalupe Cardenas, their small child, Cynthia, and Sylvia Cardenas. Killed, also, was Joe Key York, III.

Suits were subsequently filed by Main Bank & Trust on behalf of the two-year-old surviving minor, Edward Villanueva, and by Sylvia Rodriguez, as next friend of Rogelio Cardenas, the two-year-old surviving son of Juan and Guadalupe Cardenas, to recover for the wrongful deaths of the parents of the two surviving minors. These cases were consolidated for trial and were tried before a jury in the 63d Judicial District Court of Kinney County. The jury found that the collision was proximately caused by the negligence of Joe Key York, III. Judgment was accordingly entered for appellant for the damages as found by the jury in the amount of $24,000 for the pecuniary loss resulting to the minor from the death of the father, and $12,000 resulting from the death of the mother, plus the stipulated amount of funeral expenses. Mrs. Sylvia Rodriguez recovered judgment, also, on behalf of Rogelio Cardenas.

Only Main Bank & Trust has perfected an appeal, and by same it assigns ten points of error. Under its first point, appellant urges that the trial court erred in not granting an additur,[1] because the damages found by the jury are grossly inadequate as a matter of law. Under its remaining nine points, appellant asserts that the trial court erred in refusing to grant it a new trial, because the jury's answers to the damage issues are grossly inadequate and against the great weight and preponderance of the evidence. Appellant prays that this Court set aside the judgment and apply such additur as found reasonable, or in the alternative, that the cause be remanded for a new trial.

Rule 328, Texas Rules of Civil Procedure, authorizes the trial court to grant a new trial when the damages are manifestly too small or too large, and further recognizes the trial court's power to direct a remittitur. This power was recognized by the Supreme Court in Flanigan v. Carswell, 159 Tex. 598, 324 S.W.2d 835, 839 (1959), wherein the Court stated: "Since 1846, it has been within the power of the trial court to order a party to remit a portion of the damages awarded as a condition to the overruling of the other party's

---

1. It sought an additur in the trial court of a sum not less than $100,000.

motion for new trial. See Thomas v. Womack, 13 Tex. 580, 584. However, it was not until 1893, with the creation of the courts of civil appeals, that Texas appellate courts were empowered to 'suggest' (or order) remittiturs in the cases where it was deemed that the judgment was excessive." The power of the courts of civil appeals to order remittiturs has been carried forward into Rules 439 and 440, T.R.C.P.

■ Appellant concedes that there is no statutory or case-law authority for additur by this Court or the trial court. Irrespective of the question of our power to grant an additur,[2] as distinguished from our unquestioned power to grant a new trial, we must first determine from an examination of the entire record that the verdict of the jury is manifestly too small. In doing so, we must recognize that the credibility of the witnesses and the weight to be given their testimony are questions for the jury. Furthermore, we are not authorized to substitute our judgment for that of the jury simply because we might have reached a different result on the facts.

■ While there has been little written on the test to determine "inadequacy" of a jury award, it is obvious that the same test of the jury verdict should be had as for a complaint of "excessiveness." The applicable rule in considering the complaint of excessiveness was stated by this Court in Green v. Rudsenske, 320 S.W.2d 228, 235 (1959, no writ), as follows: "The law is settled that before an appellate court will disturb a judgment rendered upon a jury verdict, on the grounds that such verdict is excessive, there must be circumstances tending to show that it was the result of passion, prejudice or other improper motive, or that the amount fixed was not the result of a deliberate and conscientious conviction in the minds of the jury and

court, or so excessive as to shock a sense of justice in the minds of the appellate court." See: J. C. Penney Co. v. Duran, 479 S.W.2d 374 (Tex.Civ.App.—San Antonio 1972, writ ref'd n. r. e.); McDonough Brothers, Inc. v. Lewis, 464 S.W.2d 457 (Tex.Civ.App.—San Antonio 1971, writ ref'd n. r. e.); Missouri Pacific Railroad Co. v. Miller, 426 S.W.2d 569 (Tex.Civ. App.—San Antonio 1968, no writ).

Jose Villanueva was 31 years of age at the time of his death, and Victoria Villanueva was 21 years of age. Jose and Victoria had one other child, who was killed in the accident. In addition, Jose had three children by his first wife, from whom he was divorced in July, 1967.[3] Under the divorce decree, he was ordered to contribute the sum of $100 per month for the support of these three children. Jose was a welder by trade for several years before his death and had been self-employed since May 1, 1971. No records were available for the period of self-employment; but for the year 1970, he earned almost $7,500 while working for Alfredo Bordano. Marcelino Villanueva, a brother of Jose, was employed as a welder and earned $3.50 per hour.

The thrust of appellant's argument is that Professor George Benz, its expert witness in the field of economics, projected a substantially higher pecuniary loss after consideration of the past earnings of Jose, the probable increase in such earnings, and anticipated inflation factors over the next nineteen years. Professor Benz prepared charts which were not received into evidence; but by these charts, he demonstrated the effect of an anticipated inflation factor of two per cent per year, and an average productivity increase of five per cent per year over said nineteen years. From these calculations, he projected that Jose would be expected to earn about

---

2. See Guckian v. Fowler, 453 S.W.2d 323 (Tex.Civ.App.—Corpus Christi 1970, writ dism'd).

3. It was developed outside the presence of the jury that settlement had been made by appellee with these three beneficiaries under the Wrongful Death Statute, Article 4675, Tex. Rev.Civ. Stat. Vernon's Ann.

$280,000. He discounted this sum at the rate of four per cent per year to arrive at the sum of about $180,000 for the net projected earnings of Jose. From this discounted figure, he subtracted $100 per month for Jose's support of his three children by his first wife. In the opinion of Dr. Benz, the husband and wife would have consumed approximately one half of such earnings; and, therefore, the pecuniary loss of the minor was $84,331.

Similar projections were made on behalf of Victoria Villanueva. She was a housewife and not employed outside of the home. Therefore, as a basis for his projections, Dr. Benz took the sum of $60 per week, which figure was supplied him by the Texas Employment Commission, as the average salary of a live-in maid. He also took the minimum state teacher's salary of $6,000 annually. These figures were used to project the value of the household services and training Victoria would have furnished Edward during his minority. Based on these figures, Dr. Benz anticipated a minimum economic loss to the minor of $82,497, by reason of the death of the mother.

Dr. Benz also prepared charts wherein he projected, in a similar manner, the economic loss of the minor Rogelio Cardenas for the loss of his mother and father. Such projections were identical for the loss of the mother, but the economic loss for the loss of his father, Juan Cardenas, would only total about $61,000, since Juan's earnings at the time of his death were less than that of Jose. Appellant did not make a charge of jury misconduct, but urges, on this appeal, that the jury must have been guilty of misconduct in its deliberations, in that the jury made damage findings of $24,000 for the loss of each father, and $12,000 for the loss of each mother.

While we seriously doubt that these comparative findings alone would suggest jury misconduct, or that the damages awarded to the minor, Edward Villanueva, are inadequate as a matter of law, it is seen that although the wages of Jose Villanueva were more than those of Juan Cardenas at the time of the accident, there are other factors which could compensate for this difference in earnings. At the outset, it is seen that Juan only had two children, whereas Jose had a total of five children. The jury could find that Jose would have responsibilities to the three children by his first marriage other than as provided in the decree of 1967. Furthermore, it is seen that Juan had just completed a drafting course, and it is reasonable to assume from the testimony of Juan's employer, that his economic future could be much brighter than that of Jose, who had been fully established in his trade for some time. Obviously, the fact that the jury awarded the same amounts for the death of each of the two mothers lends strength to the jury verdict, in that the children and mothers were about the same age, and Dr. Benz, in fact, testified to identical economic loss for each.

In any event, the jury was not compelled to accept the testimony of Dr. Benz as to the economic loss sustained by reason of the death of Jose. The expert's opinion as to the probable rate of inflation or increased productivity would not be binding on the jury. Undoubtedly, some of the jurors would know firsthand that inflation does not necessarily increase one's earnings. The jury was required to determine the sum which would fairly and reasonably compensate Edward for his pecuniary loss resulting from the death of his father. It was not required to determine the projected earnings of his father. In this connection, there was no evidence regarding the expenditures, actual or anticipated, made by Jose on behalf of Edward. The only evidence regarding his family relationship was a simple conclusion by two witnesses that the Villanueva family was a normal, happy one. It would be pure speculation to assume that fifty per cent of the earnings would be consumed on Edward to

the exclusion of his brother and any other children subsequently born to this young marriage. The jury could be more influenced by the established fact that Jose contributed the sum of $100 per month for the support of three children by his first wife. Dr. Benz admitted that any sum over $10,000 could be invested at six per cent interest. Thus, the jury verdict of $36,000 would actually earn the minor over $2,100 a year without touching the principal.

In the final analysis, the testimony of Dr. Benz, however persuasive, was nothing more than expert opinion testimony. The rule is well settled that this character of testimony is but evidentiary, and is never binding upon the trier of facts. Thus, the factfinder is not cut off from exercising considerable personal judgment about how far such opinions are to be relied on. Gibbs v. General Motors Corp., 450 S.W.2d 827 (Tex.1970); Broussard v. Moon, 431 S.W.2d 534 (Tex.1968); Luttes v. State, 159 Tex. 500, 324 S.W.2d 167 (1959).

We conclude, after a review of the entire record, that the verdict of the jury regarding damages sustained by the minor for loss of his parents is not manifestly too small, nor is so against the great weight and preponderance of the evidence as to be manifestly unjust. Appellant does not complain, on this appeal, of a single error by the trial court in the admission or exclusion of evidence, nor of any other trial procedure. Nor is there any indication whatsoever in the record that the verdict of the jury was the result of any improper motive. Rather, the verdict demonstrates a deliberate and conscientious conviction of the jury to discharge its duties in accordance with the instructions of the court. It is not questioned that the sum of $36,000 is a substantial sum. While the testimony of Dr. Benz is undoubtedly sufficient to warrant a finding of damages at a greater sum than the jury was willing to assess, we cannot say that, from the record as a whole, the damages of $24,000 and $12,000 as found by the jury are so inadequate as to shock the conscience of this Court.

The judgment is affirmed.